**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

COLLEEN CHANDLER,                                )
                                                 )
                          Plaintiff,             )
                                                 )
v.                                               )    Case No. 2:25-cv-02399-EFM
                                                 )
JOHNSON COUNTY COMMUNITY                         )
COLLEGE and JOHNSON COUNTY                       )
COMMUNITY COLLEGE BOARD OF                       )
TRUSTEES,                                        )
                                                 )
                          Defendants.            )

**PRETRIAL ORDER**

On July 7, 2026, U.S. Magistrate Judge Jennifer B. Wieland conducted a pretrial conference in this case. Plaintiff Colleen Chandler appeared through counsel Ryan McEnaney. Defendants Johnson County Community College (the "College") and Johnson County Community College Board of Trustees (the "Board of Trustees") (collectively "Defendants") appeared through counsel Tara Eberline and Sara O'Keefe.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the Court's approval, or by order of the Court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1.      **PRELIMINARY MATTERS.**

        a.      **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and § 1367 and is not disputed.

        b.      **Personal Jurisdiction.** The Court's personal jurisdiction over the parties is not disputed.

        c.      **Venue.** Venue in this Court is not disputed.

    **d.**    **Governing Law.** Subject to the Court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following laws:

    **i.**    Plaintiff's age discrimination and retaliation claim are governed by the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* and the body of federal law interpreting that statute.

    **ii.**    Plaintiff's sex discrimination and retaliation claim are governed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.* and the body of federal law interpreting that statute.

    **iii.**    Plaintiff's claim for retaliatory discharge in violation of public policy (i.e. "Whistleblower Retaliation") is governed by the elements outlined in Kansas common law and the defenses provided by Kansas case law, federal case law, Kansas statutory law, and the Kansas and United States constitutions.

**2.**    **STIPULATIONS.**

    **a.**    The following facts are stipulated:

    **i.**    Defendant the Board of Trustees is the policy-making body of the College.

    **ii.**    Plaintiff is female.

    **iii.**    Plaintiff was 44 years old at the time of her termination.

    **iv.**    The College President during all relevant times was Dr. Andrew Bowne.

    **v.**    Dr. Bowne was 60 years old at the time of Plaintiff's termination.

    **vi.**    Plaintiff was employed by the College from September 2015 until her termination in October 2023.

    **vii.**    Dr. Bowne appointed Plaintiff to the role of interim Vice President of Human Resources on August 15, 2022.

    **viii.**    Dr. Bowne appointed Plaintiff to the role of Vice President of Human Resources effective February 1, 2023.

    **ix.**    As Vice President of Human Resources, Plaintiff reported directly to Dr. Bowne, the College President.

    **x.**    On July 26, 2023, in an in-person meeting, Dr. Bowne placed Plaintiff on administrative leave.

**xi.** The Board's Suspension, Demotion and Termination Policy 415.08 permits employees to appeal a recommendation for the termination of employment.

**xii.** On September 11, 2023, Plaintiff submitted an appeal of her proposed termination pursuant to the Suspension, Demotion and Termination Operating Procedure 416.02.

**xiii.** For her appeal, Plaintiff alleged the termination decision was based on her age and/or gender and/or in retaliation for raising concerns related to violations of law/non-compliance to Dr. Bowne and other executive leaders.

**xiv.** Under the procedure set forth in Policy 416.02, the Vice President of Human Resources or a designee serves as the Determining Officer for the appeal.

**xv.** The procedure permits the Determining Officer to designate a Reviewing Officer to investigate the appeal and report factual findings to the Determining Officer.

**xvi.** Because Plaintiff held the position of Vice President of Human Resources, the College designated the Chair and Co-Chair of the Board of Trustees to serve as the Determining Officers for Plaintiff's appeal.

**xvii.** Plaintiff was notified on September 11, 2023 that the College had engaged Michelle Minor Mediation to serve as the Reviewing Officer for her appeal.

**xviii.** Minor interviewed Plaintiff and other witnesses and reviewed documents provided to her.

**xix.** Minor provided her investigation report to the Determining Officers.

**xx.** The Determining Officers notified Plaintiff on October 20, 2023 that her appeal was denied and they were upholding Dr. Bowne's decision to terminate Plaintiff's employment.

**b.** The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment:

**i.** All deposition exhibits except Exhibits 13, 17, 19, 25, and 30.

**ii.** Contract C23-059-00, HR Job Architecture Consultant Rebid, between JCCC and Culpepper and Associates, Inc., executed March 1, 2023

**iii.** Board Policy 411.01 Nondiscrimination Policy (November 18, 2021 revision date)

**iv.** Board Policy 415.08 Suspension, Demotion and Termination Policy (June 21, 2018 revision date)

3

| | | |
|---|---|---|
| **v.** | Board Operating Procedure 416.02 Suspension, Demotion and Termination Appeal Operating Procedure (July 15, 2021 revision date) | |
| **vi.** | Board Policy 418.04 Compensation Policy (November 18, 2021 revision date) | |
| **vii.** | Board Policy 420.00 Employee Discrimination, Harassment or Retaliation Policy (August 14, 2020 effective date) | |
| **viii.** | Board Operating Procedure 420.01 Employee Discrimination, Harassment or Retaliation Policy (July 14, 2022 revision date) | |
| **ix.** | Board Policy 421.01 Employee Complaint Policy (July 1, 2017 effective date) | |
| **x.** | Board Policy 424.08 Whistleblower Policy (November 18, 2021 revision date) | |
| **xi.** | President Self-Assessment May 11, 2023 | |
| **xii.** | President Annual Performance Review Board Evaluation Compiled and Scored, June 2023 | |

The Court's summary judgment ruling is likely to impact what will be relevant at trial; therefore, the Parties shall meet and confer and then file a stipulation of facts and exhibits five (5) days before trial to streamline the presentation of evidence at trial, or at any other time as ordered by the District Judge.

## 3. FACTUAL CONTENTIONS.

### a. Plaintiff's Factual Contentions.

Plaintiff Colleen Chandler is a highly experienced and credentialed human resources executive who served the College for nearly eight years before being removed from her position and terminated for discrimination based on her sex and age and in retaliation for reporting serious violations of law and public policy to leadership at the College. The following facts establish the substance of her claims.

Plaintiff was hired by the College in September 2015, and served in progressively senior roles throughout her tenure, ultimately being appointed Vice President of Human Resources on

February 1, 2023. Throughout her employment with Defendants, she performed all duties of her job as required, and received promotions, praise, raises, and positive performance reviews for her work. On or about April 21, 2023, Plaintiff received a favorable performance review from the President of JCCC, Dr. Andrew Bowne, who told her she was a "very capable leader and HR professional" and that she was "what is needed in the year ahead." Dr. Bowne's written final comments in that review stated: "Colleen is an incredibly capable leader who is growing into the vice president role. I have confidence in her ability to successfully move the Human Resources team and the college forward. . . . Colleen has earned the VP role, and I have confidence in her ability to move forward successfully." Plaintiff had never been written up, placed on a performance improvement plan, or given a negative performance review during her tenure at JCCC. In fact, as of April 21, 2023, Dr. Bowne admitted that her job was not in jeopardy. Yet, he terminated her only three months later.

During the summer of 2023, Plaintiff engaged in a series of opposition conduct constituting protected activities shortly preceding her termination. In her capacity as Vice President of HR, it was not Plaintiff's job duty to report the illegal and non-compliant conduct she reported to Defendants.

In late June 2023, Plaintiff reported to College leadership that the College was engaged in illegal and non-compliant activity, including having unlicensed individuals provide mental health counseling to students and/or representing that they provide such counseling to justify higher pay in violation of Kansas law and public policy. Plaintiff researched the applicable Kansas statutes and reported the counseling licensing issue verbally to Dr. Bowne in late June 2023. Kansas law states that: "No person shall engage in the practice of professional counseling or represent that such person is a licensed professional counselor, licensed counselor or professional counselor

without having first obtained a license as a professional counselor under the professional counselors licensure act." Kan. Stat. Ann. § 65-5803(a). Plaintiff further reported the counseling issue to Provost McCloud in late June, to the Dean and Assistant Dean over the counseling staff in mid-July 2023, and again on July 20, 2023 to McCloud and the College's general counsel, then finally to the newly appointed Vice President of Student Success and Engagement, Shelli Allen.

Plaintiff also raised concerns regarding College employees having improper access to student and employee Social Security Numbers through the College's Banner system, a concern she escalated to JCCC leadership and the College's IT department. The Family Educational Rights and Privacy Act prohibits "personally identifiable information from an education record of a student without the consent required" to be disclosed to anyone that does not have "legitimate educational interests." 34 C.F.R. § 99.31(a)(1)(i)(A).

Plaintiff's termination followed her whistleblower reports with striking speed. Within six days of her last report of illegal and non-compliant activity to the College, Dr. Bowne, along with outside/current counsel, placed Plaintiff on administrative leave. Plaintiff was relieved of duty effective immediately, she was barred from the College's campus, and her email access had already been suspended before the meeting began. During that meeting, Plaintiff asked Dr. Bowne to provide examples of how she had failed to meet expectations in her role. He declined to respond to her question. However, it is undisputed that the outcome was predetermined – Dr. Bowne admitted to making the decision to terminate Plaintiff on July 26, 2023.

On August 25, 2023, Dr. Bowne sent Plaintiff a letter informing her that her employment was terminated. In the letter, he provided her with information on appealing his decision, and providing that such an appeal should be sent to outside/current counsel. Subsequently, Plaintiff sent her appeal to the College's outside counsel alleging sex and age discrimination and unlawful

6

retaliation for reporting violations of law and public policy. The College retained an outside investigator hand-selected by outside/current counsel who conducted a biased investigation. On October 20, 2023, Plaintiff's termination was affirmed.

**b.      Defendants' Factual Contentions.**

Plaintiff assumed the Vice President of Human Resources ("VP of HR") role in the midst of several high-profile projects directly affecting campus employees and knew she had a heavy lift ahead of her. In 2021, the College adopted a compensation plan increasing the College's lowest starting wage to $15 an hour in July 2022. At the same time, HR was addressing a second element of the plan, which involved contracting with a vendor to conduct market studies analyzing compensation levels and create an architecture of job descriptions for non-faculty employees (the "Project"). Though the Project was initiated before she was in the VP role, Plaintiff was involved from its inception.

Given the initiatives HR was juggling when the previous VP of HR resigned, Dr. Bowne felt the Department needed consistency, and he decided to delay the search for a new VP of HR. In August 2022, Dr. Bowne named Plaintiff the Interim VP of HR, emphasizing the importance of improving the Department's reputation with employees and ultimately delivering the significant projects already underway. Critically, Dr. Bowne had promised employees they would deliver the Project by the end of 2023.

Dr. Bowne's decision to name Plaintiff as Interim VP of HR (and eventually VP of HR) was not without criticism. Several Trustees and Cabinet members expressed concern to Dr. Bowne that Plaintiff could not successfully lead the HR Department. Nonetheless, Dr. Bowne appointed Plaintiff to the position, acknowledging she needed coaching and mentoring.  Plaintiff herself acknowledged the Department's limitations, including performance issues among staff and

strained relationships with stakeholders. Similarly, in Plaintiff's 2022 Performance Evaluation, Dr. Bowne commented that "[Colleen] knows there is a great deal of work ahead of the team" and "it is imperative that the HR team improve processes and service levels, with expectations of consistency of service and products." Further, Dr. Bowne noted "the timeliness of responses from HR has often lagged what others expect..."

A the Project moved forward, the Department continued to struggle, and Plaintiff was demonstrating a lack of leadership. In late April 2023, Dr. Bowne and the Cabinet noticed an increasing number of mistakes happening within HR, along with an apparent lack of understanding of how the Project would move forward after the contract was executed. Employees and stakeholders were losing confidence in HR's ability to implement a fair compensation structure, which risked undermining the Project altogether.

In early May 2023, the Project took another problematic turn when HR improperly sent an email regarding Position Description Questionnaires ("PDQs") to nearly 250 employees that was intended to be sent to approximately 75 "key leaders." Though Plaintiff initially acknowledged the email was a mistake, instead of owning it, the Department (at Plaintiff's insistence) tried to spin it as a "different approach."

The email mistake and subsequent communication created further confusion amongst Cabinet and employees. Because HR had opened the PDQ process to three times as many employees, they had to add another layer of stages and reviews to the Project, creating further confusion amongst employees and a perception that HR was not competent to implement something so crucial.

**Plaintiff's Termination**

When Plaintiff's management of the HR Department generally, and the Project specifically, failed to improve despite President Bowne's regular one-on-one meetings with Plaintiff, Bowne realized the Project was at risk. Dr. Bowne assembled a group of Cabinet members (the "Small Group") to help him save the Department without jeopardizing the high-profile Project.

The Small Group met for the first time on May 23, 2023, before Plaintiff alleges she engaged in any alleged protected activity.  By July 6, Fineline Consulting had sent the College a proposal to provide on-site HR consulting services for the College. With the plan ready, Dr. Bowne was prepared to recommend Plaintiff's termination. On July 26, Dr. Bowne notified Plaintiff she was being placed on paid administrative leave. Dr. Bowne explained that the HR Department had experienced a time of significant challenge, and among other things, Plaintiff had not met the expectations he set for her leadership.

That evening, Dr. Bowne notified the Board he had placed Plaintiff on administrative leave and had a plan with Fineline to assume leadership of the Department. Dr. Bowne asked the Board to approve the agreement in which Fineline's consultants would assume leadership of the Department. Fineline would assist the compensation team with completing the Project, before ultimately assisting in a search for new HR leadership.

**Plaintiff's Appeal**

On September 11, 2023 Plaintiff appealed the proposed termination, arguing it was unjustified due to "discrimination and internal whistleblowing." In her appeal, Plaintiff for the first time claimed she was being discriminated against due to her sex and age. She reported no alleged age or sex discrimination to anyone at the College prior to her termination.

In accordance with its policies, the College retained a neutral third-party investigator, Michelle Minor, to serve as Reviewing Officer, and the Board Chair and Vice Chair served as Determining Officers. Minor investigated Plaintiff's allegations, interviewed Plaintiff and witnesses, and reviewed documents before submitting written findings to the Determining Officers. On October 20, 2023, the Determining Officers notified Plaintiff they were affirming the decision to terminate her employment.

### Age and Sex Discrimination

Plaintiff failed to identify a similarly situated male employee, or a similarly situated employee under the age of 40 (or "substantially younger" than her) who was treated better than she was. Plaintiff complains about wanting an executive coach (which she was offered) and being deprived of progressive discipline (to which she was not entitled), but she has no evidence that she was deprived of either benefit because of her sex or age.

### ADEA and Title VII Retaliation

Plaintiff admits she made no complaints of age or sex discrimination before her termination. Plaintiff was notified on August 25 that Dr. Bowne was recommending her termination at the next Board meeting. Two weeks later, Plaintiff raised her discrimination claims for the first time in her appeal. Dr. Bowne had already decided to terminate Plaintiff's employment before she ever engaged in protected activity under the ADEA and Title VII.

### Whistleblower Retaliation

Plaintiff's common law whistleblower claim relies exclusively on the temporal proximity between her alleged reports of "unlawful activity" and the decision to place her on administrative leave. However, the decision to engage Fineline and remove Plaintiff was underway well before her first alleged report of 'unlawful activity" in "late June 2023."

10

Plaintiff alleges she reported two "unlawful" activities in the year leading up to her termination. Both reports were wholly within Plaintiff's job duties for the College. Plaintiff learned about the licensing concern with part-time counselors when reviewing PDQs for the Project. Plaintiff noted an inconsistency between the job duties counselors said they performed and licensure qualifications for the positions. Plaintiff then contacted the Provost, Dean, and Assistant Dean to discuss and verify the scope of job duties to determine whether the requirements needed to be changed. Plaintiff also claims she reported "unlawful" disclosure of social security numbers in an HRIS system, an issue she learned about from another HR employee who was performing her own job duties to correct the problem.

There is no evidence Plaintiff reported either of these issues to Dr. Bowne, that Dr. Bowne was otherwise aware of Plaintiff's reports, or that either report played any role in the termination decision. Furthermore, Plaintiff did not report any violation of laws, rules, or regulations pertaining to public health, safety, or general welfare.

## Conclusion

Plaintiff was terminated for legitimate, non-discriminatory, non-retaliatory reasons. Dr. Bowne made the decision to terminate Plaintiff's employment because she was not performing her job duties in a competent manner, and he did not believe Plaintiff could be successful in the VP of HR position.

4. **LEGAL CLAIMS AND DEFENSES.**

a. **Plaintiff's Claims.**

Plaintiff asserts that she is entitled to recover upon the following theories:

i. Age Discrimination (Count I) – Age discrimination in violation of the ADEA. Defendants discriminated against Plaintiff based on her age by subjecting her to false performance criticisms, failing to follow their progressive discipline practices, placing her on administrative leave,

11

wrongfully terminating her for pretextual reasons, and failing to reinstate her to her position.

ii. Retaliation – ADEA (Count II) – Retaliation in violation of the ADEA. Defendant retaliated against Plaintiff because of her opposition to unlawful age discrimination by affirming her termination and failing to reinstate her to her position.

iii. Sex Discrimination (Count III) – Discrimination in violation of Title VII. Defendants discriminated against Plaintiff based on her sex by subjecting her to false performance criticisms, failing to follow their progressive discipline practices, placing her on administrative leave, wrongfully terminating her for false, pretextual reasons, and failing to reinstate her to her position.

iv. Title VII Retaliation (Count IV) - Retaliation in violation of Title VII. Defendant retaliated against Plaintiff because of her opposition to unlawful gender discrimination by affirming her termination and failing to reinstate her to her position.

v. Kansas Public Policy Whistleblower Retaliation (Count V) – Retaliation in violation of Kansas public policy and common law. Defendant retaliated against Plaintiff for reporting serious violations of law—including Defendants' use of unlicensed individuals to provide mental health counseling to students in violation of Kansas licensing requirements and common law fraud, and employees' improper access to student and employee Social Security Numbers in violation of FERPA—by placing her on administrative leave and terminating her.

b. **Defendants' Defenses.**

Defendant asserts the following defenses:

i. Plaintiff's Complaint fails to state a claim upon which relief can be granted, and the facts do not support Plaintiff's allegations of discrimination or retaliation.

ii. Plaintiff's Complaint fails to state a claim against the Board, which was not her employer and did not take any adverse action against Plaintiff.

iii. As to Counts II and IV, Plaintiff did not engage in any protected activity prior to the adverse employment action at issue. Plaintiff did not raise any complaints of age or sex discrimination until after she was notified of her termination. The facts do not support Plaintiff's retaliation claims under the ADEA or Title VII.

iv.   As to Counts I, II, III, and IV, the College's conduct toward and treatment of Plaintiff was legitimate, non-discriminatory, non-retaliatory, and undertaken in good faith.

v.   As to Counts I, II, III, and IV, to the extent any alleged discrimination or retaliation was a motivating factor with respect to any employment actions taken by the College, which it was not, the same actions would have been taken in the absence of a motivating factor.

vi.   As to Counts I and II, Plaintiff cannot recover damages for emotional distress because such damages are not available under the ADEA.

vii.   There is no causal connection between Plaintiff's alleged protected activity, if any, and any alleged adverse action.

viii.   Plaintiff cannot recover on her whistleblower and retaliation claims because any reports or complaints she made did not constitute protected activity. Any such reports were made in the course of performing her job duties to communicate human resources concerns to Defendants, not for the purpose of engaging in protected activity.

ix.   Plaintiff cannot establish that any employment action involving Plaintiff was pretext for unlawful discrimination or retaliation.

x.   Plaintiff cannot establish that she was treated differently from similarly situated employees outside of her protected class(es). Plaintiff has not identified a similarly situated male employee who was treated more favorably than her, nor has she identified a similarly situated employee under the age of forty who was treated more favorably than her.

xi.   Plaintiff cannot establish that her age was the "but for" cause of her termination or other adverse employment action.

xii.   Plaintiff was at at-will employee of the College and was not entitled to progressive discipline or performance coaching prior to her termination. Defendants do not have a policy requiring non-bargaining unit employees progressive discipline.

xiii.   Defendants took reasonable steps to prevent and promptly correct any alleged unlawful conduct, discrimination, or retaliation. Plaintiff never reported any alleged discrimination or retaliation during her employment, and the decision to terminate Plaintiff was reviewed by an independent, third-party investigator.

xiv.   No impermissible factors played any role in Defendants' decisions at issue in this case. Specifically, any protected activity or reports of alleged unlawful activity did not play any role in the Defendants' decisions. Neither Plaintiff's age nor her sex played any role in Defendants' decisions.

13

xv.     Plaintiff's subjective beliefs as to the reasons for her employment termination or other adverse employment action are insufficient as a matter of law to establish pretext.

xvi.    Plaintiff's claims are barred by the after-acquired evidence doctrine. Following Plaintiff's termination, Defendants obtained evidence of additional performance issues and misconduct that, had Defendant known of such issues, would have resulted in the termination of Plaintiff's employment.

xvii.   Plaintiff's claims for punitive damages are barred by the United States Constitution because the asserted standard for entitlement to punitive damages is vague and arbitrary and the procedure for the assessment of punitive damages violates Defendant's rights to due process of law, equal protection, the right to be free from unlawful taking of property, the right to be free from excessive fines, and all other substantive and procedural protections of the Constitution applicable to punitive damages.

xviii.  Plaintiff's claims for punitive damages under Title VII are barred under 28 U.S.C. § 1981a(b)(1) because Defendants are municipalities under Kansas law and therefore political subdivisions for the purposes of Title VII's provisions prohibiting recovery of punitive damages against a government, government agency, or political subdivision.

xix.    Plaintiff's damages, if any, are not of the nature or extent alleged.

xx.     Plaintiff failed to take sufficient measures to mitigate her alleged damages.

xxi.    Plaintiff's claims for compensatory damages, back pay, lost benefits, and other damages are all speculative in nature.

xxii.   Plaintiff's claims for damages are barred to the extent she seeks amounts in excess of the applicable limits imposed by Title VII.

xxiii.  As to Count V, Plaintiff's claim for damages is barred to the extent she seeks amounts in excess of amounts permitted by K.S.A. 75-6105.

xxiv.   Defendants did not engage in any intentional, willful, or wanton retaliation or discrimination with malice or reckless indifference to Plaintiff, and Defendants are not liable for actual, compensatory, liquidated, or punitive damages.

xxv.    Plaintiff's claim for attorneys' fees is barred because she has failed to produce any evidence to support her Title VII and ADEA claims, and she cannot establish a prima facie case of age or sex discrimination or retaliation.

5.    **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

    a.  **Economic Damages** (common to all Counts) – Lost wages and benefits from August 25, 2023, to July 1, 2026 (34 months). Plaintiff's annual salary at the time of her termination was $165,413, and her annual benefit value was $57,827. Therefore, Plaintiff's annual compensation was $223,240 (or $18,603.33 per month). As of July 1, 2026, Plaintiff's lost wages and benefits total $632,513.33. Plaintiff will also seek lost wages and benefits equaling $18,603.33 per month through the date of trial.

    b.  **Liquidated Damages** (ADEA) – In an amount equal to an award of Plaintiff's lost wages and benefits which are, to date, $632,513.33, plus approximately $18,603.33 per month through the date of trial.

    c.  **Emotional Distress Damages** (Title VII, Retaliation in violation of Kansas public policy and common law) – Damages for emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to reputation, loss of self-esteem, and humiliation in an amount exceeding $500,000.

    d.  **Equitable Relief** (common to all Counts) – Reinstatement, or in lieu of reinstatement, five years of front pay and benefits in excess of $1,115,000.

    e.  **Statutory Interest** – At the rate permitted by law as of the date of judgment.

    f.  **Attorneys' Fees and Costs** – If Plaintiff is the prevailing party at trial, she will seek reasonable attorneys fees ranging from $325 per hour for Ms. Neuberg; $475 per hour for Mr. McEnaney; $575 per hour for Raymond Dake; and $700 per hour for Eric Smith. As of July 1, 2026, Plaintiff has incurred approximately $75,000 in attorneys fees. The statutory basis for Plaintiff to recover her reasonable attorneys fees is pursuant to the ADEA and Title VII.

6.    **AMENDMENTS TO PLEADINGS.**

None.

7.    **DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by June 15, 2026. Discovery is complete, though Defendants are continuing to produce ESI responsive to Plaintiff's Second Requests for Production of Documents. Defendants anticipating completing their document production by July 17, 2026.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the Court will not be available to resolve any disputes that arise during the course of discovery.

8.      **MOTIONS.**

    a.      **Pending Motions.**

    None.

    b.      **Additional Pretrial Motions.**

    After the pretrial conference, the parties intend to file the following motions:

        Defendants intend to file a motion for summary judgment.

        If this case proceeds to trial, the parties intend to file motions *in limine.*

    The dispositive-motion deadline, as established in the scheduling order and any amendments, is **August 1, 2026**. The parties should follow the summary-judgment guidelines on the Court's website:

    https://ksd.uscourts.gov/sites/ksd/files/Summary-Judgment-Guidelines%202023.pdf

    Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

    **Any motion requesting an extension of the dispositive motion deadline or briefing deadlines will likely result in the extension of the trial date.**

    c.      **Motions Regarding Expert Testimony.** There are no expert witnesses in this case.

16

**9.    TRIAL.**

The trial docket setting is **April 6, 2027, at 9:00 a.m., in Kansas City, Kansas**. This case will be tried by jury. Trial is expected to take approximately 5 days. The Court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.    ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows: The parties unsuccessfully mediated this case on March 5, 2026. The parties currently believe the prospects for settlement of this case are moderate, but at this time, they do not believe that further ADR would be helpful until after any summary judgment motions are ruled upon. They will continue to engage in informal communications regarding additional potential ADR.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the Court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the Court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated July 10, 2026, at Kansas City, Kansas.

Jennifer B. Wieland
U. S. Magistrate Judge

17